IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LORA JOHANSEN,<br><br>    Plaintiff,<br><br>v.<br><br>COMBINED METALS OF CHICAGO, LLC,<br>d/b/a ELGILOY SPECIALTY METALS,<br><br>    Defendant. | Case No. 22 C 00326<br><br>Hon. LaShonda A. Hunt |

## MEMORANDUM OPINION AND ORDER

Self-represented[1] Plaintiff Lora Johansen sued her former employer Defendant Combined Metals of Chicago, LLC d/b/a Elgiloy Specialty Metals for violating the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* after she was terminated due to a reduction in force. Defendant has moved for summary judgment on her complaint. (Dkt. 107). For the reasons discussed below, Defendant's motion is granted.

### BACKGROUND[2]

**I.    Plaintiff's Employment**

Defendant supplies specialty metals and provides services to clients in the aerospace, automotive, appliance, electronic, oil and gas, and tractor-trailer industries. (Dkt. 121 at ¶¶ 2-5). In 2005, Plaintiff was hired by Defendant as an Inside Sales Representative ("ISR") at its Elgin,

---

[1] Although Plaintiff filed a counseled complaint, her attorney's motion to withdraw was granted by the previously assigned district judge on 2/16/2023 (Dkt. 46). This case was reassigned to Judge Hunt on 6/5/2023 (Dkt. 50).

[2] The relevant facts are taken from Plaintiff's Response to Defendant's Statement of Undisputed Facts in Opposition to its Motion for Summary Judgment, which the Court refers to as "Dkt. 121" for brevity. The Court notes that Plaintiff submitted her own additional facts (Dkt. 120) to which Defendant responded (Dkt. 126). Upon review of those "additional facts," however, the Court finds that they are irrelevant, duplicative of information contained in Dkt. 121, or unsupported as required by Local Rule 56.1. Thus, they are not considered for purposes of this ruling.

1

Illinois location. (*Id.* at ¶ 9). As an ISR, Plaintiff's duties included quoting customer orders, selling products, processing purchase orders, expediting orders, coordinating order shipping, addressing customer complaints, and reviewing specifications for materials. (*Id.* at ¶ 10). As of June 4, 2020, Plaintiff was one of four ISRs in Elgin. (*Id.* at ¶ 13). The others were Jacqueline Becker (age 50), Jamie Carey (age 49), and Holly Stahler (age 49). (*Id.*). During the time period relevant to her complaint, Plaintiff (age 63) was reporting to Sales Manager Nick Choban (age 37), who in turn was reporting to Business Manager Michael Phillipp (age 54). (*Id.* at ¶¶ 2, 12).

## II. **Plaintiff's Job Performance**

The parties diverge somewhat in describing Plaintiff's job performance. While Defendant says it was "generally satisfactory," Plaintiff contends that she regularly received "above average" and "excellent" marks on performance reviews. (*Id.* at ¶¶ 14-15). Defendant agrees that Plaintiff consistently exhibited "above average" performance in the areas of job knowledge, attitude, and quality/quantity of work and sometimes received "excellent" marks in those categories. (*Id.* at ¶ 15). However, those same performance reviews also identified organization, time management, and attendance as areas in which Plaintiff needed to improve. (*Id.* at ¶ 16). Plaintiff maintains that this feedback was the result of an unbalanced, heavy workload which placed more work on her than others. (*Id.*).

In June 2016, Plaintiff received a disciplinary warning notice for being late to work on three consecutive days and failing to make suitable progress in organizing her workspace and removing clutter from her desk. (*Id.* at ¶ 17; Ex. 8 to Johansen Dep., Dkt. 110-16). Plaintiff was instructed to arrive on time and organize her workstation. (*Id.*). In response to the warning notice, Plaintiff stated that she had been ill and was overwhelmed by too much work at a time when there were only three ISRs working due to the fourth ISR being out on medical leave. (*Id.* at ¶ 18).

2

### III. Alleged Age-Related Remarks

Plaintiff claims that Choban and Phillipp made a series of age-related comments throughout the course of her employment, including that the company needed "new blood," remarks about how Plaintiff walked and used the bathroom, calling her a dinosaur, and questioning her but not younger employees about attendance. (*Id.* at ¶ 22). According to Phillipp, he was not aware of or denied making any of these alleged age-related comments. (*Id.* at ¶ 23).

Defendant contends that, sometime in 2018-19, Choban and Phillipp were informed by Carey and Stahler that Plaintiff was telling others in the office she planned to retire. (Dkt. 121 at ¶ 19). Choban and Phillipp called Plaintiff into Phillipp's office to ask if this was true. (*Id.* at ¶ 20). Plaintiff says the conversation occurred in the latter part of 2019. (*Id.* at ¶ 19). According to Defendant, Phillipp and Choban asked Plaintiff about retirement because they needed advanced notice as training someone to replace Plaintiff could take six months to one year. (*Id.* at ¶ 20). Nothing about Plaintiff's position, on a day-to-day basis, changed as a result of this discussion. (*Id.* at ¶ 21).

### IV. COVID-19 Pandemic and Resulting Reduction in Force ("RIF")

The parties disagree about the impact of the COVID-19 pandemic on Defendant's business. (Dkt. 121 at ¶ 25). While Defendant claims that the pandemic "significantly" impacted business, Plaintiff believes only that it had "some" impact. (*Id.*). According to Phillipp, Defendant's primary industry—the aerospace industry—came to "almost a complete standstill" which caused business to drop "precipitously," around 75% over the course of a few months, by his estimate. (*Id.* at ¶ 26). Phillipp further stated that the decrease in sales led to a corresponding "tremendous" decrease in the workload of Defendant's sales team. (*Id.* at ¶ 27).

On May 6, 2020, Plaintiff was informed by Choban that "due to market effects of the COVID-19 Pandemic, [Defendant had to] implement drastic measures to ensure the long-term financial stability of the company." (*Id.* at ¶¶ 29-30; Johansen Dep. Ex. 2 at 1, Dkt. 110-17). Defendant imposed a rotating one-week furlough schedule among the ISR staff starting the following week. (*Id.*). Plaintiff admitted that she never questioned whether the furloughs were connected to the market effect from the pandemic, she had no independent insight into the market effects of the pandemic, and she did not know about Defendant's finances at that time. (Dkt. 121 at ¶ 31). Plaintiff did not know the true impact of the pandemic on Defendant's business because she was "not in a financial position to know." (*Id.* at ¶ 32).

In early June 2020, Defendant implemented a company-wide reduction in force. (*Id.* at ¶¶ 34-35). Phillipp stated he was instructed by upper management to reduce the number of ISRs and that it was a "difficult decision." (*Id.* at ¶¶ 36-37). In determining which ISR to terminate, Defendant considered the need for ISRs with computer skills in Excel, Outlook, and various other internal computer applications, good organization and time management, and selling ability. (*Id.* at ¶¶ 38-39; Phillipp Dep. at Ex. 34, Dkt. 110-6).

According to Phillipp, Choban reviewed the "pros and cons" of each ISR, and he and Choban determined that Plaintiff would be terminated as part of the RIF. (*Id.* at ¶ 40). Specifically with regard to Plaintiff, Phillipp and Choban determined that her relevant computer skills were not on the same level as the other ISRs—another ISR had prior experience with one of the internal programs, the other ISRs exhibited a higher proficiency in the software, and Plaintiff had the greatest difficulty in the past with the implementation of a new computer program. (*Id.* at ¶ 42). Plaintiff's performance reviews from 2014-16, while generally positive, repeatedly stated that she needed to demonstrate the ability to use an internal computer program ("ACT") as an effective

4

sales tool. (*Id.* at ¶¶ 43-44). In response, Plaintiff points out that from the period of late 2017/early 2018 to early 2019, all four ISRs were rated as "meeting expectations" for "ACT Utilization." (*Id.* at ¶¶ 42, 44; Phillipp Dep., Ex. 24 at 779, Dkt. 122). Additionally, in 2016, Plaintiff's review indicated that she had over 5,000 emails in her Outlook account (which caused it to load slowly) and had been told to clean up her inbox more than once. (*Id.* at ¶ 44).

In terms of organization and time management, Choban determined that Becker and Stahler "vastly outperform[ed]" Plaintiff in this area and while Carey and Plaintiff were similar in these skills, Carey "demonstrated a desire and willingness to work extra hours" to complete daily tasks. (*Id.* at ¶¶ 46-47). Choban pointed out that in 2017, after Plaintiff complained about an increase in her workload, she did not take Defendant up on its offer to help her determine how to better manage her time. (*Id.* at ¶ 48). Further, Defendant sent Plaintiff to a time management class to help her with those skills but contends that she consistently failed to show notable improvement in this area. (*Id.* at ¶¶ 48-50). Time management and organization were regularly identified in Plaintiff's performance reviews as areas in which she needed to improve, and Plaintiff was once issued a warning about her cluttered workspace. (*Id.* at ¶ 50). Plaintiff herself has acknowledged that she was regularly told she needed to improve her organizational skills, particularly at times when her workload was increasing, and that this critique dated as far back as 2006. (*Id.* at ¶ 51). Plaintiff argues that Choban offered organization assistance to all ISRs, but she was the only one who did not receive the promised help. (*Id.* at ¶ 50). Further, she points out that her 2020 performance review stated that she met expectations for organization and had shown improvement. (*Id.* at ¶ 49).

In terms of selling ability, Choban determined that while all the ISRs maintained good customer relations, Carey and Stahler both had prior sales training and "demonstrated the ability to cold call potential prospects and win new business." (*Id.* at ¶¶ 52-53). And Becker was better

5

than Plaintiff at obtaining customer feedback on quotes. (*Id.* at ¶ 53). In a 2014 performance review, Plaintiff was instructed to spend more time on new account development, and her 2020 review instructed her to talk to customers about what Defendant needed to do to win more business and be aggressive in "convincing buyers to provide a second look on future inquires." (*Id.* at ¶ 55). In response, Plaintiff points out that in Becker's 2020 review, various areas were noted as "needing improvement" that relate to sales and that in Plaintiff's 2020 review, she "exceeded expectations" in terms of generating business through both new and dormant accounts. (*Id.* at ¶¶ 52-53, 55). She further highlights that Becker's 2020 review also noted that she "needed improvement" in developing new accounts and that Defendant wanted to see "more aggressive selling." (*Id.* at ¶ 55). Plaintiff also points out that Stahler's 2020 review labeled her as "meeting expectations" for new account development despite failing to meet the goal. (*Id.*)

Finally, Choban found that Becker, Carey, and Stahler demonstrated a "much higher level of independence" in performing their duties than did Plaintiff. (*Id.* at ¶ 54). Specifically, Becker, Carey, and Stahler asked Choban fewer questions on a daily basis where he had to inform them to check with the appropriate department, compared to Plaintiff. (*Id.*) And Plaintiff admittedly had difficulty managing an increased workload during times when the team was operating with three ISRs as opposed to four. (*Id.* at ¶¶ 56-57).

V.     **Plaintiff's Termination**

Defendant terminated Plaintiff's employment on June 4, 2020. (*Id.* at ¶¶ 1, 62). Phillipp claims that he and Choban's conversation with Plaintiff about whether she planned to retire did not impact any of his employment decisions. (*Id.* at ¶ 21). Rather, Defendant claims that her termination was part of the RIF necessitated by the COVID-19 pandemic, reasoning Plaintiff disputes. (*Id.* at ¶¶ 1, 58, 62). Phillipp characterized the decision as "very difficult," stated that

6

Plaintiff was not a poor performer, and that, based on everything he knew at the time he made the decision and everything he has learned since, he still would make the same decision. (*Id.* at ¶¶ 59-61). From the date of Plaintiff's termination to June 4, 2021, Defendant did not hire any new ISRs at its Elgin, Sycamore, or Hampshire locations. (*Id.* at ¶ 64).

### VI. Procedural History

Plaintiff filed a charge of discrimination before the Equal Employment Opportunity Commission in September 2020. (Mem. of Law in Supp. of Def.'s Mot. to Dismiss Pl.'s Sex Discrimination Claim, Ex. 1 at 38, Dkt. 20-1).[3] She then initiated the present lawsuit in December 2021, asserting claims of sex and age discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* and the ADEA, respectively. (Compl. at 1, Dkt. 1). Plaintiff voluntarily dismissed her sex discrimination claim with prejudice on May 11, 2022. (Dkt. 22). Defendant has moved for summary judgment on Plaintiff's remaining ADEA claim. The motion is fully briefed and ripe for disposition.

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial," *Celotex*, 477 U.S. at 324, and support their position with "more than a scintilla of evidence." *Conley v. Vill. of Bedford Park*, 215 F.3d 703, 709 (7th Cir. 2000). Summary judgment is proper "against a party who fails

---

[3] Unless otherwise noted, page numbers in citations to the docket reference "PageID #" in the CM/ECF header of the filing, not other page numbers in the header or footer of the document.

to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. All "justifiable" inferences are drawn in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *see also Runkel v. City of Springfield*, 51 F.4th 736, 741 (7th Cir. 2022) (non-moving party receives "benefit of conflicting evidence" as well as "any favorable inferences that might be reasonably drawn from the evidence."). Additionally, a court must refrain from weighing evidence or making credibility determinations. *Johnson v. Advocate Health & Hosps., Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citation omitted).

## **DISCUSSION**

The ADEA prohibits "arbitrary age discrimination in employment" and serves to "help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Specifically, the statute makes it unlawful "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age[.]" 29 U.S.C. § 623(a)(1). "The ADEA protects workers 40 years of age and older from age-based employment discrimination." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018).

To succeed on a claim of age-based discrimination, Plaintiff "must prove that [her] age was the 'but-for' cause of the challenged job action." *Id.* "In other words, . . . it's not enough to show that age was *a* motivating factor. The plaintiff must prove that, but for [her] age, the adverse action would not have occurred." *Id.* (citation and quotations omitted) (emphasis in original). The ADEA does not protect against discrimination with mixed motives. *Id.*

A plaintiff may prove an ADEA case through either the direct or indirect method. *Tubergen v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 517 F.3d 470, 473-476 (7th Cir. 2008). Under the

8

direct method, a plaintiff may prove her case with "direct or circumstantial evidence that the employer's decision to take the adverse job action was motivated by an impermissible purpose[.]" *Id.* at 473 (citation and quotations omitted). Examples of circumstantial evidence include suspicious timing or behavior. *Id.* To proceed under the indirect method, a plaintiff must prove that (1) she was a member of a protected class; (2) who was meeting the legitimate expectations of her employer; (3) suffered an adverse employment action; and (4) similarly situated employees outside of the plaintiff's protected class or those "substantially younger" were treated more favorably than the plaintiff. *Id.* at 475. *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) (articulating burden-shifting test for use in cases alleging employment discrimination).

If a plaintiff meets those requirements, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas*, 411 U.S. at 802. If the employer is successful, the burden then shifts back to the plaintiff to demonstrate that the employer's proffered reason is pretextual. *Igasaki v. Ill. Dep't of Fin. and Pro. Regul.*, 988 F.3d 948, 957 (7th Cir. 2021) (quoting *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020)). Because the parties analyze Plaintiff's claim under the indirect method, the Court follows suit.

### A.  Similarly Situated or "Substantially Younger" Employees

Defendant argues only that Plaintiff cannot satisfy the fourth prong of the *McDonnell Douglas* test. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 543-547, Dkt. 108). "A similarly situated employee is one whose performance, qualifications, and conduct are comparable in all material respects." *Widmar v. Sun Chemical Corp.*, 772 F.3d 457, 463 (7th Cir. 2014). The fourth prong turns on whether "similarly situated employees under the age of forty were treated more favorably." *Marnocha v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021). The emphasis is on determining "whether all things are in fact equal" because

9

"[a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination." *Id.* (citations and quotations omitted). It serves to eliminate "other possible explanatory variables, such as differing roles, performance histories, or decision-making personnel[.]" *Id.* (citations and quotations omitted). In a similar reduction in force scenario, the Seventh Circuit has held that the fourth prong considers whether younger employees were treated more favorably, rather than whether a younger employee replaced the terminated employee. *Id.* at 720.

Defendant contends that Plaintiff "cannot identify a similarly situated, substantially younger comparator who either received better treatment, or replaced Plaintiff after her termination." (Def.'s Mem. in Supp. at 543, Dkt. 108). The Court agrees. Plaintiff points to Becker, Carey, and Stahler as comparators, each of whom was above the age of 40 and therefore within Plaintiff's protected class. However, given that they were 49 and 50 at the relevant time, each is presumptively considered to be "substantially younger" than Plaintiff who was 63. *Tubergen*, 517 F.3d at 475 n.4 ("Under the ADEA, in the case of younger employees that fall above the age of forty, the age difference must be ten years or greater in order to be presumptively substantial."). Nevertheless, Becker, Carey, and Stahler were not comparable to Plaintiff in "all material respects."

Plaintiff acknowledges that she, Becker, Carey, and Stahler were all ISRs at Defendant's Elgin location who reported to Choban and were held to the same standards and expectations. (Pl.'s Resp. at 724, Dkt. 119). The difference, then, lies in the performance history of each individual, and this is where Plaintiff's claim fails. As Defendant points out, the decisionmakers looked primarily at the ISRs' computer skills, organization and time management, and selling ability. Plaintiff makes much of the fact that she regularly earned positive marks on her

10

performance reviews, and, specifically in 2020, earned better marks than other ISRs in certain categories. But that argument misses the mark. Of the categories Defendant considered, selling ability was only one consideration, and Defendant has admitted that Plaintiff was not terminated because she was a poor performer. So even if the Court credits Plaintiff's contention that she was a better seller than her fellow ISRs (a characterization the Court takes no position on), Plaintiff does not sufficiently dispute that her organization, time management, and computer skills fell below those of Becker, Carey, and Stahler.

As early as 2006, Defendant indicated that Plaintiff needed to improve her organizational skills. Put simply, the record reflects that she continued to struggle with organization in ways the other ISRs did not until her termination in 2020. In fact, it appears from the record that Defendant provided Plaintiff alone with time management training and that, on at least one occasion, Plaintiff did not avail herself of assistance when Defendant offered it. Rather than meaningfully respond to Defendant's argument, Plaintiff complains about her heavy workload, policies she deemed "inefficient," the "large ceiling vent blowing" onto Plaintiff's desk causing dust, and a donation box taking up space at her workspace. (Pl.'s Resp. at 711-13, 721, Dkt. 119). But ultimately, Plaintiff admits that she struggled with organization, particularly when things were busy and there were only 3 ISRs. And despite claiming that once, in late 2018 to early 2019, all ISRs received the same rating for use of one computer system, Plaintiff fails to meaningfully dispute that she struggled with the computer skills required for the job. Plaintiff clearly believed that certain computer systems were not used regularly or did not work properly. (*Id.* at 714, 716). But her personal belief about the technological aptitude required for the job cannot be used to stave off summary judgment. *See e.g., Dale v. Chi. Trib. Co.*, 797 F.2d 458, 465 (7th Cir. 1986) (explaining

11

that "[plaintiff] must do more than challenge the judgment of [her] superiors through [her] own self-interested assertions.")

"An employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." *Simpson v. Franciscan Alliance, Inc.*, 827 F.3d 656, 662 (7th Cir. 2016). Because no reasonable jury could conclude that Plaintiff and the remaining ISRs were comparable, Plaintiff cannot prove a prima facie case of age discrimination.

### B. Pretext

Assuming that Plaintiff could establish a *prima facie* case of age discrimination (which the Court finds she cannot), her claim would nonetheless fail because she cannot prove that Defendant's legitimate, nondiscriminatory reason for Plaintiff's termination—a company-wide RIF necessitated by the economic impact of the COVID-19 pandemic—is pretextual.

Pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 68 (7th Cir. 1995). "In order to show that the employer's stated, nondiscriminatory reason for firing him is pretextual, the plaintiff must present evidence suggesting that the employer is dissembling. . . . The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011). Pretext may be established in two different ways: "directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 983 (7th Cir. 1999) (quoting *Sarsha v. Sears, Roebuck & Co.*, 3 F.3d 1035, 1039 (7th Cir. 1993)). "Indirect evidence of pretext showing that an employer's proffered reasons are not credible may be made by demonstrating that the

reasons are factually baseless, were not the actual motivation for the discharge, or were insufficient to motivate the discharge." *Id.*

At bottom, Plaintiff cannot point to anything in the record to demonstrate that Defendant lied about its rationale for her termination. It is well established that the COVID-19 pandemic was unprecedented and caused a "precipitous" decline for many businesses. Here, Plaintiff concedes her lack of insight into Defendant's finances at the time of the RIF. And the record supports Defendant's statement that terminating Plaintiff was a "difficult decision." Overall, by March 2020, she had received generally positive performance reviews and performed better in some categories than her fellow ISRs. Defendant's desire to avoid termination is reflected in its initial approach to the tumultuous and uncertain time—temporary, rotating furloughs which initially kept all four ISRs employed. But when that strategy did not work, Defendant considered each ISRs' organization, time management, selling ability, and computer skills when determining who to terminate. Plaintiff has not come forward with any evidence, other than her own speculation, to show that the decision to RIF her was based on discriminatory animus.[4]

Plaintiff also contends that age-related statements demonstrate pretext. (Pl.'s Resp. at 716). Specifically, Plaintiff points to a comment about Defendant needing "new blood" (which was not directed specifically at her), mocking of how she walked and used the bathroom, calling her a dinosaur, and subjecting her to questions about her attendance and retirement plans that were not asked of younger employees. For starters, the Court fails to see how anything about Plaintiff's walk or using the bathroom bears upon her age. But even assuming, *arguendo*, that all these

---

[4] Plaintiff argues that, given her success with sales, Defendant's terminating her "goes against logic." (Pl.'s Resp. at 717). But as the Seventh Circuit found, in reductions of force, "it is not pretextual to terminate an individual perceived to be a weak performer in an organization even if that individual's performance could also be characterized as satisfactory or adequate." *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 794 (7th Cir. 2006).

13

comments reflect ageism, in the end, they are nothing more than stray remarks unrelated to the RIF "and thus insufficient to support an inference of pretext." *Schaffner v. Glencoe Park Dist.*, 256 F.3d 616, 623 (7th Cir. 2001) (comments about employee lacking enthusiasm and energy, being "settled," and being "unwilling to grow with the program" were stray remarks which failed to demonstrate pretext). *See also Schreiner v. Caterpillar, Inc.*, 250 F.3d 1096, 1099 (7th Cir. 2001) ("[C]omments must be related to the adverse decision. . . . Stray workplace comments **unrelated to the alleged discriminatory employment decision** are not sufficient to support an inference of discrimination.") (emphasis added).

One could argue that a prudent company would have retained a fifteen-year sales veteran when times became tough. As discussed at length in the parties' briefing and *supra*, Plaintiff appeared to be an accomplished ISR who excelled in some areas where her younger co-workers struggled. But "a court cannot interfere because an employer's decision is unwise or unfair." *Widmar*, 772 F.3d at 464. Indeed, it is not the Court's role to "measure the success of a given strategy," *Tubergen*, 517 F.3d at 476, or to "sit as a super-personnel department that reexamines an entity's business decisions." *Dale,* 797 F.2d at 464. Rather, the Court is solely tasked with deciding if the evidence demonstrates that Defendant honestly believed the reason it offered for Plaintiff's termination. Under the circumstances presented here, Plaintiff has not carried her burden to show that Defendant is lying to cover up discriminatory animus. Because Plaintiff cannot prove her *prima facie* case or show pretext, summary judgment is granted in favor of Defendant.[5]

---

[5] The Court need not consider Defendant's argument that Plaintiff failed to mitigate her damages. (Def.'s Mem. of Law in Supp. of Mot. for Summ. J. at 551-52, Dkt. 108).

## **CONCLUSION**

For all the foregoing reasons, Defendant's motion for summary judgment is granted.

**DATED**: October 31, 2025  **ENTERED**:

*LaShonda A. Hunt*
LASHONDA A. HUNT
United States District Judge